UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| *In re Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding*<br><br>ATHOS ASIA EVENT DRIVEN MASTER FUND; KEVIN XIN LU; FOURWORLD EVENT OPPORTUNITIES, LP; BCIM STRATEGIC VALUE MASTER FUND, LP; MASO CAPITAL ARBITRAGE FUND LIMITED; and MASO CAPITAL INVESTMENTS LIMITED,<br><br>                  Petitioners,<br><br>  v.<br><br>THE CRAWFORD GROUP, INC.,<br><br>                  Respondent. | Case No. _____ |

**APPLICATION FOR AN *EX PARTE* ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782**

Petitioners Athos Asia Event Driven Master Fund; Kevin Xin Lu; FourWorld Event Opportunities, LP; BCIM Strategic Value Master Fund, LP; Maso Capital Arbitrage Fund Limited; and Maso Capital Investments Limited (collectively, "Petitioners") respectfully request an order in the form attached hereto permitting Petitioners to obtain certain limited discovery under 28 U.S.C. § 1782 ("Section 1782"), as reflected in the proposed subpoena attached as **Exhibit 1**, in connection with an appraisal proceeding pending in the Grand Court of the Cayman Islands (the "Cayman Court"). In support of this application, Petitioners submit a Memorandum of Law and the attached exhibits, which include the Declarations of Kyle J. Kolb (the "Kolb Declaration") (**Exhibit 2**) and Marc Allan Kish (the "Cayman Declaration") (**Exhibit 3**) and further state as follows:

1

## INTRODUCTION

1.  Petitioners seek the assistance of this Court to obtain discovery from The Crawford Group, Inc. ("Crawford" or "Respondent") under Section 1782. Petitioners were shareholders of eHi Car Services Limited ("eHi" or the "Company"). Petitioners dissented from the merger that took place in February 2019, when Crawford and other buyers took the Company private. Petitioners are participants in an appraisal proceeding currently pending in the Cayman Islands regarding the fair value of their shares (the "Appraisal Proceeding"). The discovery cannot be obtained directly in the Appraisal Proceeding, but is welcomed by the Cayman Islands courts. As set forth in more detail in the Cayman Declaration, the discovery sought through this application is for use by the Petitioners' valuation expert in connection with his valuation report due on **May 7, 2021**. Further, the Cayman Court did not object to Petitioners seeking discovery under Section 1782.

2.  Section 1782 permits litigants in foreign proceedings to obtain discovery in the United States to assist in the foreign litigation. In particular, Section 1782(a) states:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made . . . upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

3.  The requirements of § 1782 are satisfied here. As explained in the accompanying submissions and below, (1) Crawford is "found" in St. Louis, Missouri, (2) the discovery sought is to be used in the Appraisal Proceeding, and (3) Petitioners are each an "interested person" in that proceeding.

4. This application also meets the discretionary factors of Section 1782, as explained further in the accompanying Memorandum of Law: (1) Crawford is not a party to the Appraisal Proceeding, (2) Cayman Islands courts are receptive to U.S. court assistance, (3) Petitioners are not attempting to circumvent foreign proof-gathering restrictions, and (4) the document requests and deposition topics are not unduly intrusive or burdensome. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004). Petitioners' narrowly tailored requests are set forth in the subpoena attached as **Exhibit 1** hereto, and they relate to the fair value of the shares of the Company held by Petitioners, and the process leading to the sale of eHi.

## BACKGROUND[1]

Crawford's History with eHi

5. Crawford is a Missouri corporation headquartered in St. Louis that is the parent company of Enterprise Holdings, Inc. ("Enterprise") (which is itself the parent company of Enterprise Rent-a-Car, National Car Rental, Alamo Rent a Car, and Enterprise CarShare). *See* **Ex. 5**. The Company was founded in 2006 and, as of June 2018, provided car rentals and services to customers in the People's Republic of China, with a rental fleet of nearly 70,000 vehicles. **Ex. 4** (Proxy) at 3. Crawford and the Company entered into an affiliation agreement beginning in 2012, through which eHi became the exclusive Chinese-partner of Enterprise. Crawford, through its controllers, was also a major shareholder of the Company at all relevant times, with over 20% of

---

[1] References to "Ex." refer to the exhibits attached to this application. The Company disclosed certain background facts leading to the merger in the Schedule 13E-3 filed with the Securities and Exchange Commission (the "SEC") on March 11, 2019. **Ex. 4** (the "Proxy"). For purposes of this application, Petitioners do not contest any of the facts stated in the Proxy.

3

the shares at the end of 2017, and had a seat on the Company's board of directors (the "Board").

*See* **Ex. 7** at Item 4.[2]

6.  The Company is an exempted company with limited liability incorporated under the laws of the Cayman Islands. *See* Proxy at 3. As described in the Company's filings with the SEC:

> The Company's mission is to provide comprehensive mobility solutions as an alternative to car ownership by best utilizing existing resources and sharing economy to create optimal value. eHi distinguishes itself in China's fast-growing car rental and car services market through its complementary business model, customer-centric corporate culture, broad geographic coverage, efficient fleet management, leading brand name, and commitment to technological innovation. eHi is the exclusive strategic partner in China to the brands Enterprise Rent-A-Car, National Car Rental and Alamo Rent A Car owned by Enterprise Holdings, Inc., the largest car rental provider in the world.

**Ex. 12** at 5.

7.  The Company's shares were publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol "EHIC" before the going-private merger. *See* **Ex. 14** ¶ 4.[3]

The Original Merger Negotiations

8.  On November 27, 2017, the Company publicly disclosed that it had received an acquisition proposal from an affiliate of Asian private equity fund MBK Partners ("MBKP"), Goliath Advisors Limited ("GAL"), offering $6.675 per Share in a going-private transaction. On

---

[2] At the relevant time, Greg Stubblefield was the Crawford designee on the Company's Board. Proxy at 12. Mr. Stubblefield was a director of Crawford and the Executive Vice President and Chief Strategy Officer of Enterprise. *Id.*

[3] The Company was the issuer of common shares, consisting of Class A common shares (each, a "Class A Share"), including the Class A Shares represented by American Depositary Shares, each representing two Class A Shares ("ADSs"), and Class B common shares (each, a "Class B Share" and, collectively with Class A Shares, "Shares" and, each, a "Share"). Proxy at 3. Holders of Class B Shares are entitled to ten votes per share, whereas holders of Class A Shares are entitled to one vote per share. *See id.* at 9.

December 9, 2017, the Company's founder, Chairman, and CEO reached out to Crawford to update them on the Company's plan to form a special committee, after which Crawford publicly disclosed that it might consider participating in a going-private merger transaction. Proxy at 24; **Ex. 7**.

9. The Company's Board established a three-member special committee on December 11, 2017 to evaluate a potential going-private transaction (the "Special Committee"). Proxy at 24.

10. On January 1, 2018, the Company received a second proposal, at the same price as GAL's proposal, presented on behalf of a consortium made up of: (i) a different MBKP affiliate; and (ii) the Company's Chairman and CEO, Ray Ruiping Zhang. Proxy at 25 (January 1, 2018 offer).[4] Mr. Zhang appears to have then worked to expand the consortium to include others, reaching out to Crawford and the Baring Asia Private Equity Fund ("Baring"). *See, e.g.*, Proxy at 26. Diligence and negotiations continued over the following months, with Baring joining the consortium. *See* Proxy at 27 (discussing the formation of the "Original Consortium").

11. On February 22, 2018, Crawford entered into a confidentiality agreement with the Company to learn more about the negotiations. Proxy at 27.

12. On April 2, 2018, however, the Company received a proposal from Ocean Link Partners Limited ("Ocean Link"), which owned a competitor of the Company, CDH Car ("CDH"). *See* Proxy at 5 (disclosing that CDH Car is wholly owned by Ocean Imagination, a fund managed by Ocean Link).

13. Ocean Link's proposal competed with the consortium's offer, offering a higher price of $7.25 per share. Ctrip Investments ("Ctrip"), which was a large shareholder and had a seat

---

[4] Mr. Zhang is also a shareholder, holding 5.1% of the Company's Shares.

on the Company's Board, indicated it would support Ocean Link's proposal over the consortium offer.

14. On April 3, 2018, the Zhang-led consortium increased their offer to $6.75 but declined to match Ocean Link's offer.

15. On April 4, 2018, the Special Committee then unanimously voted to recommend that the Board approve the Original Buyer Group's offer and enter into the merger contemplated thereby.

16. On April 6, 2018, Crawford and two other investors also joined the consortium (collectively, the "Original Buyer Group"). The Original Buyer Group held 29.3% of the Company's ADSs/Shares and 36.7% of the voting rights of the Company's shareholders. *See* **Ex. 9** at 7. That same day, after receiving the Special Committee's recommendation, the Board voted to approve the Original Buyer Group's offer and enter into the going-private merger.

17. The Board approved the transaction over the refusal of Ctrip's board designee to vote on the transaction. Proxy at 33.

The Revised Merger Negotiations

18. The members of the Original Buyer Group, Crawford, Ctrip, and CDH then initiated several legal proceedings, which delayed the merger from going forward. *See* Proxy at 14-15, 35-39.

19. During this period, Crawford began to purchase more Shares through two secondary market purchases, both at a price of $7.25 per Share, in May and August 2018. Proxy at v, 52 (describing the ICG ROFO Purchase Agreement and the GS ROFO Purchase Agreement). One of these purchases involved additional Class B Shares (which, as discussed supra, had increased voting power), and both included an agreement that the purchased shares would be voted

in favor of the Original Buyer Group's merger (the "ROFO Purchases"). Proxy at 8. In June 2018, Ctrip also increased its offer to $7.75 per Share. Proxy at 38.

20. On September 5, 2018, members of Ocean Link and Ctrip contacted the Company's founder, Chairman and CEO and Crawford's director on the Board about potentially cooperating to take the Company private. Proxy at 39. By the beginning of 2019, the parties were discussing a global settlement and new terms for a potential merger in which Ctrip and certain members of the Original Buyer Group would jointly take the Company private.

21. The Original Buyer Group was also discussing with the Special Committee's legal counsel whether New Access Capital International Limited and New Access Investments Group Ltd. (collectively, "New Access") would sell its shares in the Company (including its coveted Class B Shares). Proxy at 40, 42. New Access's director, Andrew Xuefeng Qian, was also a member of the Special Committee, but he did not resign from the Special Committee at that time.

22. Ultimately, the new set of consortium buyers (the "Updated Buyer Group")—which included Crawford—held 47.3% of the Company's Shares and 76.2% of the voting rights of the Company's shareholders. *See* **Ex. 11** at 7.

23. On January 23, 2019, this Updated Buyer Group provided a proposal to the Special Committee, with a revised price of $6.125 per share. Proxy at 40.

24. On the morning of February 18, 2019, Mr. Qian, the chairman of the Special Committee, resigned at the start of the Special Committee meeting to consider the final terms of the revised offer. The Special Committee's remaining two members voted to recommend the merger to the Board.

25. A majority of the full Board approved the terms of the new merger at the Board meeting held minutes later. Proxy at 42.

The Merger's Terms

26. The Company then entered into the amended and restated agreement and plan of merger on February 18, 2019 (the "Merger Agreement"). Proxy at Annex A (the Merger Agreement). Under the Merger Agreement, following the completion of the transactions contemplated therein, the surviving company would be 100% beneficially owned by the Updated Buyer Group, and the Company would be delisted from the NYSE and continue to do business as a private company (the "Merger").

27. The Company's shareholders (other than certain shareholders exempted from receiving payments) would have their Shares canceled in exchange for the right to receive $6.125 per Share, and each ADS would be canceled in exchange for the right to receive $12.25 per ADS. The Merger consideration valued the Company at approximately $864 million. **Ex. 11** at 9.

28. The Merger Agreement could not become effective unless it was authorized and approved by (i) the affirmative vote of the holders of Shares representing a majority of the aggregate voting power of the Company, (ii) the affirmative vote of a majority of the Company's outstanding Class A Shares ("Majority Class A Approval"), and (iii) the affirmative vote of holders of Shares representing at least two-thirds of the voting power of the Shares voting at the extraordinary general meeting of the Company's shareholders to be held to consider the Merger. *See* Proxy at 9; Merger Agreement § 3.04(a).

29. Two of these approvals, however, were a foregone conclusion because of certain voting agreements entered into with individual shareholder groups before the Board's approval of the Merger Agreement.

30. Specifically, (i) the Rollover Shareholders (as defined in the Proxy, which includes Crawford), which represented 47.7% of the issued and outstanding Shares and approximately 77.96% of the outstanding voting power of the Company, (ii) New Access, which represented

0.3% of the issued and outstanding Shares and approximately 0.6% of the outstanding voting power of the Company, (iii) the Baring shareholders, which represented 14.3% of the issued and outstanding Shares and approximately 1.4% of the outstanding voting power of the Company, and (iv) the GS Sellers (as defined in the Proxy), which represented 6.5% of the issued and outstanding Shares and approximately 12.4% of the outstanding voting power of the Company, all agreed to vote in favor of the approving the Merger Agreement. Proxy at 9.

31. The following chart shows that only the Majority Class A Approval was not already locked in before the Board's approval of the Merger Agreement:

| Group | Share % | Voting Power % |
|---|---|---|
| Rollover | 47.7 | 77.96 |
| New Access | 0.3 | 0.6 |
| Baring | 14.3 | 1.4 |
| GS Sellers | 6.5 | 12.4 |
| Total | 70.8 | 92.36 |
| % Needed | 50.1% | 66.67% |

32. Under Section 6.04 of the Merger Agreement, the Company agreed to a "no-shop" provision that restricted its ability to seek alternative buyers pending the shareholders' approval of the Merger.

33. The Merger Agreement allows the Board to change its recommendation to the Company's shareholders to vote in favor of the Merger only if it receives a Superior Proposal (as defined in the Merger Agreement), after which the Company must still pay a hefty termination fee of over $14 million to the Updated Buyer Group. *See* Proxy at 118.

The Merger is Approved

34. The Company held an extraordinary general meeting of shareholders on April 8, 2019, before which the Dissenting Shareholders delivered written objections to the Merger. **Ex. 14** ¶ 11.

35. Despite the Dissenting Shareholders' objections, the Merger was approved at the extraordinary general meeting of shareholders held on April 8, 2019. **Ex. 14** ¶ 10.

36. The Company's ADSs ceased trading on the NYSE on April 9, 2019. Petitioners and the other Dissenting Shareholders delivered notices of dissent to the Merger under Section 238 of the Companies Law (2018 Revision) of the Cayman Islands ("Section 238") between May 6, 2019 and May 16, 2019. **Ex. 14** ¶ 13.[5]

The Appraisal Proceeding

37. The Company thereafter offered to purchase the Dissenting Shareholders' Shares at $6.125 per Share. **Ex. 14** ¶ 14. All of the Dissenting Shareholders rejected this offer. *Id.* As required by Section 238, the Company initiated the Appraisal Proceeding by filing a Petition with the Cayman Court on June 24, 2019, seeking a determination of the fair value of the Dissenting Shareholders' Shares in the Company.

38. In the Appraisal Proceeding, the Cayman Court issued a directions order dated February 18, 2020 (the "Directions Order") setting forth the timetable and procedures governing the proceeding. **Ex. 3** ¶ 15; **Ex. 15** (Directions Order); **Ex. 17** (current timetable for the Appraisal Proceeding).

39. The Company and the Dissenting Shareholders have each retained an expert to opine on the fair value of the Company's Shares. The Dissenting Shareholders retained Dr. Mark Zmijewski, a professor emeritus at The University of Chicago Booth School of Business that is affiliated with Charles River Associates. **Ex. 3** ¶ 17.

40. Under the Directions Order (as subsequently amended to reflect extensions of certain deadlines), the Company completed its document disclosures via an electronic data room

---

[5] Section 238 is included as Annex D to the Proxy.

on December 18, 2020, and thereafter provided its factual evidence on January 8, 2021. The Company declined to collect and disclose Crawford's director's documents and communications related to the subject matter of the Appraisal Proceeding requested by the Dissenting Shareholders' expert. **Ex. 3** ¶¶ 22-24. In declining to do so, the Company stated only that it had disclosed documents within its "possession, custody or power," which is the applicable standard under Cayman Islands law.

41. Thus, absent the Company's agreement to voluntarily collect evidence from Crawford, discovery cannot be sought from third parties to the Appraisal Proceeding, such as Crawford. **Ex. 3** ¶ 24. The Company has in fact refused to do so. **Ex. 3** ¶ 23.

42. Expert reports are required to be exchanged by May 7, 2021. **Ex. 17** at Schedule 2, Item 16.

43. Despite the limited nature of discovery available in a Section 238 proceeding in the Cayman Islands, Cayman Islands courts have accepted that parties may seek discovery under Section 1782 for use in a Cayman Islands proceeding. Indeed, Cayman Islands courts have emphasized the need to consider *all facts* and matters that may be relevant to the experts' and the Cayman Court's fair value determinations, including third-party valuations. *See* **Ex. 3** ¶ 34-36; *see also id.* **Ex. 16** ¶ 27.

44. Here, in the Directions Order, the Cayman Court acknowledged that all parties may seek discovery under Section 1782, and required that notice of any Section 1782 applications be given to the Cayman Court and the parties to the Appraisal Proceeding. **Ex. 15** ¶ 43. The Directions Order was entered with the consent of the Company's counsel.

45. Accordingly, Petitioners are filing the instant application under Section 1782 to obtain for the Dissenting Shareholders' expert relevant information regarding the "fair value" of

the Petitioners' Shares and the sale process. Petitioners' application includes a proposed subpoena (the "Subpoena"), which seeks documents and testimony from Crawford (the "Requests"). Accordingly, Petitioners seek this Court's authorization to serve the Subpoena and obtain the requested discovery from Crawford promptly, to enable the Dissenting Shareholders' expert an opportunity to evaluate this discovery before the May 7, 2021 deadline for the exchange of expert reports.

46.     Thus, Petitioners respectfully request that this Court expeditiously grant their Application for an Order authorizing Petitioners to serve Crawford with the subpoena attached as **Exhibit 1**.

WHEREFORE, Petitioners respectfully request that this Court enter an Order:

1.      Granting their Application for discovery under 28 U.S.C. § 1782;

2.      Authorizing Petitioners to take discovery under Section 1782 from Crawford, by issuing the proposed subpoena;

3.      Directing Crawford to comply with the subpoena issued in this case in accordance with the Federal Rules of Civil Procedure and the Rules of this Court.

Dated:  March 1, 2021         Respectfully Submitted,

        /s/ Christopher J. Lang
Christopher J. Lang #49256
NICHOLS LANG & HAMLIN, LLC
1795 Clarkson Road, Suite 230
Chesterfield, MO 63017
Tel: (314) 429-1515
Fax: (314) 428-9592
chris@nlh-law.com

and

Sean E. O'Donnell (2907186(NY))
Kyle J. Kolb (5014121(NY))
George Utlik (4570610(NY))
HERRICK, FEINSTEIN LLP
Two Park Avenue
New York, New York 10016
Tel: (212) 592-1400
sodonnell@herrick.com
kkolb@herrick.com
gutlik@herrick.com

*Attorneys for Petitioners*